# LANSBURGH v. PARKER.

TRUSTS AND TRUSTEES; PROMOTERS; JOINT LIABILITY; SECRET PROFITS.

1. Trustees are only responsible for their own acts, and not for the acts of each other, unless they have made some agreement by which they have engaged to be bound for each other, or they have, by their own voluntary co-operation or connivance, enabled some one or more of them to violate the trust. (Following *Colburn* v. *Grant,* 16 App.

D. C. 107, affirmed 181 U. S. 601, 45 L. ed. 1021, 21 Sup. Ct. Rep. 737.)

2. One of several persons interested in effecting a sale of real estate through the organization of a syndicate for its purchase will not, assuming them to have been cotrustees or copromoters, be held liable to the subscribers to the syndicate, who acted upon the representation of another of such interested persons that the syndicate would obtain the land for a named price, which was in fact greater than that paid, where it does not appear that the person sought to be held participated in obtaining subscriptions to the syndicate or derived any profit therefrom.

No. 2592. Submitted January 7, 1914. Decided March 2, 1914.

HEARING on an appeal by the plaintiffs from a decree of the Supreme Court of the District of Columbia, sitting as a court of equity, in a suit to recover secret profits alleged to have been made by certain defendants in the formation of a syndicate for the purchase of land. *Affirmed.*

The COURT in the opinion stated the facts as follows:

Appellants, James Lansburgh, Julia Luchs, Abraham D. Prince et al., filed a bill in equity on behalf of themselves and of other members of a certain syndicate, seeking to recover from defendants, excepting Nellie L. Parker, secret profits alleged to have been made by them in the formation of the syndicate.

It is alleged that defendants Paul, Parker, Sands, Norton, Beardsley, and Hannan induced plaintiffs and others to join in the formation of a syndicate to purchase certain land in the District of Columbia, known as the "Marshall Brown" tract. It is also alleged that plaintiffs were induced to purchase the land upon the representation that the land, which belonged at the time to what was known as the "Brown Farm Syndicate," could be purchased at $1,300 per acre, or about $237,000, of which all but $167,000 would have to be paid in cash.

It appears that defendant Myron M. Parker and one Emmons, as trustees of the Brown Farm Syndicate, had been au-

thorized by that company to sell the land at not less than $1,000 per acre. On being advised that a sale of the land had been made by Sands and others, the sale was duly ratified, and no complaint is here made by the members of the earlier syndicate. It also appears that Parker, representing the Brown Farm Syndicate, negotiated with Sands to sell the land to persons who should form the new syndicate. In the fall of 1891, Sands represented to Parker that he had been unable to secure sufficient purchasers to complete the syndicate, and requested Parker to get someone to acquire the necessary number of purchasers; whereupon Parker enlisted Hannan, of Detroit, Michigan, who secured a number of purchasers. Beardsley was brought into the transaction by Hannan, as was also Norton. Later, in March, 1892, Hannan wrote Parker that some of the purchasers he had secured had withdrawn, and that he would not be able to fill up the syndicate, asking Parker to get the remaining subscriptions, on which he would allow him the commission he was to receive. Parker thereupon obtained subscriptions for six interests. When the subscriptions were closed, it was found that one forty-eighth interest was not taken. This was taken by Parker, who, according to the evidence, had not intended to become interested in the new syndicate. Later, it appearing that this interest had been subscribed by one Gans, Parker transferred it to him.

It further appears that the interests acquired by plaintiffs were purchased through one Bieber. It is not contended that the plaintiffs ever met any of the defendants in this transaction, or had any communication with them. It does, however, appear that Bieber was acting for defendant Sands. Neither Bieber nor Sands testified in this case. Plaintiff Lansburgh testified that he was induced to purchase his interests through Bieber, a real estate man, and had no dealings with anyone except him; that Bieber represented to him that the land could be bought for $240,000, one third cash; that he purchased a 1/24 interest for $10,000, and gave him a check for one third of that amount; that Bieber gave in return a receipt signed by himself, in which he stated that he, Bieber, held himself person-

ally responsible for the return of the amount should the syndicate fail to be completed; that Bieber told him that he would be on the ground floor the same as anybody else; that he had full confidence in Bieber, and that he had no knowledge that the persons who were the owners of the property were selling it for $1,000 per acre. Plaintiff Prince testified that he went into the syndicate by purchasing through Bieber, and upon substantially the same representations as had been made to Lansburgh. There is no testimony as to what inducements were offered plaintiff Luchs.

The testimony as to Hills's purchase is given by one Shaw, who stated that Beardsley called his attention to the investments, and that witness wrote to Hills, proposing to take a $10,000 share if Hills would do so, and advance the payment for both, and take the shares as security, which was done; that he does not know what representations were made to induce him to join the syndicate, and that Hills finally took witness's share in addition to his own. He also testified that he had no knowledge of the fact that the property was being purchased for $1,000 and being resold for $1,300 per acre.

*Mr. Alexander Wolf* and *Mr. Charles H. Merillat* for the appellants.

*Mr. John Ridout, Mr. J. J. Darlington,* and *Mr. John H. Patterson* for the appellees.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

Upon a full review of the testimony, we agree with the learned justice below that, from the testimony, plaintiffs were not induced to join the syndicate by statements and representations or by any concealment on the part of defendants, except in so far as defendant Sands may have availed himself of the services of Bieber in securing the subscriptions to Lansburgh and Prince. There is no contradiction of the testimony of Parker that he took no part in securing the subscriptions of any of

the plaintiffs; that he did not know that Lansburgh, Prince, or Luchs were subscribers until a month after the transaction had been closed, when Sands sent in a list of the names of persons to whom certificates should be issued; that he had no acquaintance with Bieber or Hills, or anyone representing the latter, and that he had made no statement to them and had no business relations with them.

This case, we think, can be disposed of very briefly. Conceding that Sands, Parker, Norton, Hannan, and Beardsley were cotrustees or copromoters, which by no means clearly appears, there is no evidence showing that anyone of them, except Sands, took any part in securing the subscriptions of the plaintiffs, or that any of them, except possibly Sands, participated in the profits derived from plaintiffs' subscriptions. "Trustees * * * are only responsible for their own acts, and not for the acts of each other, unless they have made some agreement by which they have engaged to be bound for each other, or they have, by their own voluntary co-operation or connivance, enabled some one or more of them to violate the trust." *Colburn* v. *Grant,* 16 App. D. C. 107, affirmed in 181 U. S. 601, 45 L. ed. 1021, 21 Sup. Ct. Rep. 737.

It appeared that Myron M. Parker had received commissions upon certain loans paid to him by the American Security & Trust Company, amounting to $2,250, repayment of which he tendered in his answer. The court decreed that he should pay this sum to himself as trustee for the Marshall Brown Syndicate, and account therefor as trustee to the members of that syndicate. It was further decreed that Sands pay Lansburgh the sum of $2,287.50, and Prince the sum of $1,143.75, with interest from April 18, 1892, together with costs of this action, and that the bill be dismissed as to the other plaintiffs.

We think that plaintiffs have no reason to complaint of their treatment in the court below. Everything was awarded to them of which the evidence, under any reasonable inference, would admit. The decree will therefore be affirmed, with costs.

*Affirmed.*